[No. D016896. Fourth Dist., Div. One. May 6, 1993.]

NATIVE SUN/LYON COMMUNITIES et al., Plaintiffs and Appellants, v. CITY OF ESCONDIDO et al., Defendants and Respondents.

## COUNSEL

Gatzke, Mispagel & Dillon, Mark J. Dillon and Lori D. Ballance for Plaintiffs and Appellants.

David R. Chapman, City Attorney, Jeffrey R. Epp, Assistant City Attorney, Gray, Cary, Ames & Frye, Michael M. Hogan and David E. Watson for Defendants and Respondents.

## OPINION

**TODD, J.**—Plaintiff, Native Sun/Lyon Communities, a California general partnership (Native Sun), appeals "from the 'Statement of Decision,' filed on

March 12, 1992, rendering judgment in favor of respondents on the first, second and third causes of action of plaintiff's First Amended Petition for Writ of Mandate and Complaint, as modified and confirmed in the 'Order On Application For Reconsideration,' filed on April 24, 1992." The statement of decision to which the notice of appeal is addressed grants a partial judgment, rendering judgment on the first three causes of action and directing the respondents, the City of Escondido (the City), its city council (the Council) and planning commission (the Commission), "to file their answer to the remaining causes of action within fifteen days" and ordering a case management conference "for the purpose of setting a date for trial on the remaining causes of action."[1]

Generally, the causes of action in question involve the City's approval of a new environmental impact report (EIR) under the California Environmental Quality Act (CEQA; Pub. Resources Code,[2] § 21000 et seq.) and the state CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. [hereinafter Guidelines]) and the City's refusal to approve modifications to an approved tentative map for a 222-unit single family residential development on 33 acres of land in Escondido, which would result in a 102-unit development on the same land. The original EIR for the 222-unit project was completed in 1978 and found all significant adverse environmental impacts were mitigated. The new EIR ordered and completed in 1990 found that significant unmitigated environmental effects may result from the proposed, modified 102-unit project. After Native Sun had worked with City planners concerning the modification for a significant period of time, the City cited the new EIR it had recently approved, stating the new EIR: "identifies significant unmitigated environmental impacts regarding visual/aesthetics, and the cumulative impacts on traffic, police services, schools, solid waste and libraries. No findings [of] overriding consideration have been made for the significant unmitigated impacts, and the City Council has determined that there is not a basis for such findings of overriding consideration." The City found, among other things, the site "is not physically suitable for this type of development" for reasons set forth in the new EIR and a certain letter of the City's director of planning and building. The City then denied the modification to the originally approved tentative subdivision map, and further resolved:

"The City Council makes no findings on the modification to the Master Development Plan and the Precise Plan in that such actions are zoning

---

[1] At oral argument we asked the parties for additional briefing on the question of whether this is a proper appeal under the one final judgment rule. We are satisfied the statement of decision, deemed an order, is properly appealable. (See *Elmore* v. *Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 190-191 [205 Cal.Rptr. 433].)

[2] All statutory references are to the Public Resources Code unless otherwise specified.

decisions pursuant to Article 1044 of the Escondido Zoning Code and are legislative and discretionary in nature and do not require findings. In addition, the City Council makes no findings with respect to the denial of the Development Agreement in this project in that entering into the Development Agreement is a matter of legislative discretion, and no findings are required for this action. The City Council makes findings in connection with the denial of the Grading Exemption, and such findings are contained in [the next adopted resolution]."

The resolutions were adopted May 1, 1991. Although the matter is an issue in this case, in the ordinary course of events, the original tentative map, approved on December 8, 1983, would have expired on August 18, 1991, 120 days after expiration of the City's earlier granted "friendly moratorium." The earlier "friendly moratorium" prohibited Native Sun from processing the approved tentative map for the 222-unit project until April 18, 1991, or until Native Sun stopped processing the project with due diligence, or until Native Sun obtained a final map through negotiation with the City. By the time of the March 12, 1992, statement of decision by the trial court, the August 1991 date had long since passed. The trial court determined that the moratorium provisions of the Government Code did not apply to extend the life of the previously approved tentative map; the life of that map had expired.

Native Sun contends (1) the EIR is legally inadequate because it fails to adequately identify and analyze obvious, reasonable and feasible mitigation measures which could have avoided or otherwise reduced the identified "aesthetic/visual" and "cumulative" effects of the proposed project; (2) the EIR is inadequate because it fails to adequately identify and analyze the development agreement which is part of the project description and is, therefore, an indisputable component of the proposed project; (3) City failed to proceed in a manner required by law by not adopting written findings with respect to Native Sun's proposed master development plan, precise development plan and development agreement; and (4) City's decision to deny approval of the proposed project resulted in a statutory development moratorium to be in effect under Government Code section 66452.6, subdivision (f)(1), part of the Subdivision Map Act, as a result of City's imposing a condition that City prepare, complete and approve a certain growth management plan entitled a subarea facilities/financing plan prior to approval of the proposed project.

We find no basis for reversal in Native Sun's first three contentions concerning the adequacy of the EIR and the absence of findings with respect to the specified plans and development agreement. However, we find under

the facts of this case the law provides for imposition of a moratorium on the running of the life of the original approved tentative map; therefore, the trial court erred in determining the original tentative map had expired.

FACTS

Native Sun owns approximately 33 acres of unimproved property at the northwest corner of North Broadway and Jesmond Dene Road in the City. Native Sun purchased the property in March 1988. Native Sun's property is within the City's "North Broadway Neighborhood Subarea." The growth management element of the City's general plan identifies a number of neighborhood subareas and assigns "Tier designations" for these subareas. The North Broadway Neighborhood Subarea is designated as a "Tier 2A— Urbanizing Neighborhood []" in the City's growth management element. Under the growth management element, new development within tier 2A will be required to have facilities plans prepared.

The North Broadway subarea facilities plan, which is required to be prepared and approved by the City, is not yet completed; further work on the plan is indefinitely suspended; and the anticipated completion date of the plan is unknown.

The proposed project is a modification to a portion of a previously approved master development plan and tentative subdivision map for tract No. 572. The proposed modifications reduce residential development from 222 units to 102 units, a 54 percent reduction in the number of previously approved homes on the site, and allow the dedication of 4.3 acres of additional parkland to complement the prior dedication of approximately 35 acres of parkland that is currently developed as Jesmond Dene Park.

The proposed project also consists of a precise development plan for the detailed design of the development, a grading exemption and a development agreement. The development agreement contains provisions: (1) extending the life of the previously approved tentative subdivision map; and (2) committing Native Sun to the payment of its reasonable fair share of any facilities fees imposed by the North Broadway subarea facilities plan, if and when it is ever adopted.

The proposed project is at a density of 3.62 dwelling units per acre, with an average lot size of 7,919 square feet. The proposed density is consistent with both the City's general plan designation for the property, "Urban I," which permits up to 5.5 dwelling units per acre, and the City's zoning designation for the property, "planned development-residential" (PD-R),

which permits up to 4.9 dwelling units per acre. The project is also consistent with the residential density projections specified for the tier 2A area of the City's general plan. The proposed project, referred to as "the Oaks" development, is surrounded by existing and planned urban development.

The 33-acre project site was once part of a larger 202-acre parcel, under single ownership, located on both sides of North Broadway, between Rincon Avenue and North Avenue in the City. The first significant development approval for the larger project site occurred in 1978.

On July 26, 1978, the Council approved a development plan for the entire 202-acre site to allow development of 545 units. Prior to that approval, the Council reviewed and considered a final environmental impact report (Final EIR 453), which addressed all of the potentially significant environmental effects of the 545-unit project, and concluded that all of the identified impacts were mitigated to a level of insignificance.

On August 9, 1978, as a condition to the City's prior approval, approximately 35 acres of parkland were dedicated to the City. This parkland is currently developed as Jesmond Dene Park. The people of the City, as well as the people in the unincorporated area of the County of San Diego, have had the use and benefit of the park (without any burdens of development) for more than 13 years.

On July 23, 1980, the Council considered and approved an amended development plan for a 30-acre portion of the 202-acre site, which is now owned by Native Sun. At that time, the Council approved the development of 131 residential units on the 30-acre site. In approving the project, the Council found that: (1) Final EIR 453 was adequate for the 131-unit project; (2) the project was consistent with applicable general and specific plans; and (3) the project's design was suitable for the area under the Subdivision Map Act.

On December 7, 1983, the Council approved the rezoning of the entire 202-acre site to a planned development allowing up to 4.9 dwelling units per acre. In connection with that action, the Council also approved an amended development plan and a tentative subdivision tract map for the phased development of 987 units on the 202-acre site. Phase 3, the 33-acre site now owned by Native Sun, was approved for 222 units. The approved tentative subdivision map was valid originally for up to three years. (Gov. Code, § 66452.6.)

On April 1, 1987, the Council approved an additional three-year extension of time for the approved tentative map (Tract 572). This action extended the life of the previously approved tentative map to December 8, 1989.

In March 1988 Native Sun purchased a 33-acre portion of the master planned site (Tract 572) from Leisure Technology. By doing so, Native Sun acquired an interest in the approved tentative map allowing development of 222 units. The site, excluding the area dedicated to the City for Jesmond Dene Park, is currently owned by two separate entities: Native Sun and Leisure Technology.

After purchasing the property in March 1988, Native Sun submitted an application to the City for a precise development plan and modifications to the previously approved tentative subdivision map. In June 1988 the Commission found that Native Sun's application complied with CEQA because of a previously approved negative declaration, and because there were no significant unmitigated environmental effects of the project. However, the Commission disapproved the proposed 222-unit development because it found that the size of the homes was larger than originally approved in 1983. Native Sun then withdrew its application.

In August 1988 Native Sun submitted a new precise development plan for 222 units in exact compliance with the layout and size of units originally approved in 1983. The new precise development plan was scheduled for a public hearing before the Commission on September 13, 1988. However, at a Council hearing on August 24, 1988, involving Leisure Technology's final maps for its project, the Council directed that staff reschedule Native Sun's pending application before the Commission. The Council further directed that, if Native Sun continued with the Commission hearing, staff should "recommend denial without prejudice."

At the same time the Council established a subcommittee to work with Native Sun and Leisure Technology to guide a redesign of the two separate projects. After the Council prevented Native Sun's precise development plan from going forward, Native Sun began negotiations with the City and participated in numerous neighborhood meetings to attempt to reach a settlement to guide the redesign of the previously approved project.

From August 1988 through 1989 Native Sun engaged in extensive negotiations with representatives of the City subcommittee and other interested persons and participated in numerous neighborhood meetings for the purpose of redesigning its project. A formal application for a substantially revised project was submitted to the City, but processing of the application was "suspended" to further respond to environmental and redesign issues.

On January 18, 1989, after extensive negotiations between Native Sun, the City's subcommittee and residents in the surrounding area, the Council held

a public hearing to consider a scaled-down 120-unit project. At the hearing, the Council unanimously approved a reduction in the total dwelling units for the revised project (from 222 units to 120 units), and approved the terms of Native Sun's development agreement, which included, among other things, a 2-year allocation of building permits starting in 1989 and payment of impact fees at current levels. At that time, Councilman Harmon characterized the parties' action as "an effort to basically renegotiate a map that had already been approved," with the end result being a "better product" than "would have been built otherwise." In addition, it was agreed at the staff level that Native Sun would not record a final map on its existing development plan in order to allow the processing of the 120-unit project and the associated development agreement.

In January 1989, in reliance upon the agreement reached with the City, Native Sun incurred substantial expenses in preparing and submitting substantial modifications to the previously approved project, as well as preliminary landscape and architectural plans for the 120-unit project. In March 1989 Native Sun memorialized the terms of the agreement reached with the City regarding the 120-unit project to facilitate the City's processing of the development agreement.

In April 1989 Native Sun was advised by the City's staff that the California Department of Fish and Game (DFG) had expressed concern regarding the 120-unit project. In redesigning the project, Native Sun had originally proposed not only to reduce the density from 222 to 120 units, but to relocate Jesmond Dene Creek and Jesmond Dene Road. However, the DFG concluded that relocation of the creek and road would result in potentially significant biological effects, requiring a streambed alteration agreement. In response to concerns of the DFG and as the result of numerous additional neighborhood meetings, Native Sun further redesigned the project to retain the creek and the road in their present alignment.

On October 18, 1989, after receiving public comments, the Council approved a further reduction in the total dwelling units for the project from 120 units to 102 units and approved amendments to the prior agreement between Native Sun and the City. In addition, the Council also authorized Native Sun to continue to process the development agreement which incorporated the terms of the amended agreement between the City and Native Sun. At that time, the development agreement was seen as a mutually desirable mechanism for, among other things, extending the life of the previously approved tentative subdivision map that was due to expire in December 1989. Prior to the anticipated expiration date, Native Sun requested that the Council establish a development moratorium on its property,

which would prohibit the recordation of any final map for Tract No. 572 in order to toll expiration of the previously approved map.

On November 1, 1989, the Council adopted a resolution approving a development moratorium on Native Sun's development project. The moratorium prohibited the processing and recording of any final maps for any portion of Tract 572 until the earlier of: (1) April 18, 1991; or (2) until Native Sun stopped pursuing approval of a development plan with due diligence or (3) obtained approval of a final map.[3]

In November 1989 Native Sun prepared and submitted another substantially revised tentative map, a precise development plan, architectural plans and landscape plans for the 102-unit project. In December 1989 Native Sun requested that the City rely on previously approved Final EIR 453 as the environmental analysis to the 102-unit project. However, at that time, City staff advised Native Sun that the original EIR (EIR 453) was "questionable" in its "applicability" to Native Sun's 102-unit project.

In February 1990, over Native Sun's objections, the City determined that Native Sun's 102-unit project required a new EIR. The new EIR, EIR 89-55, was prepared in 1990. Final EIR 89-55 addresses the "significant" environmental effects of Native Sun's 102-unit project and identifies impacts that remain significant even after mitigation.

On February 26, 1991, the Commission held a public hearing to consider the 102-unit project and Final EIR 89-55. Before the hearing, the City planning department prepared a staff report which identified the following issues: (1) whether appropriate "overriding findings" could be made under CEQA for the perceived significant unmitigated environmental impacts identified in Final EIR 89-55; (2) the compatibility of the project with surrounding properties due to the proposed density, lot size, building mass, grading and visual appearance; and (3) the "[a]ppropriateness of the Development Agreement terms, particularly regarding the timing of public improvements, issuance of building permits, and payment of [development] fees as [these issues] relate to the findings of the North Broadway Subarea Facilities Plan." City staff then recommended denial of the project because,

---

[3]Government Code section 66452.6 provides for a "development moratorium." Government Code section 66452.6, subdivision (b)(1), states that the time period for the expiration of an approved tentative map does not include the time during which a development moratorium is in existence. In essence, then, a development moratorium tolls expiration of an approved tentative map while the moratorium is in effect. The approved tentative map generally expires 120 days after termination of the development moratorium. (See Gov. Code, § 66452.6, subd. (b)(3).)

"in the absence of a Subarea Facilities Plan, the funding and construction of facilities to meet the deficiencies identified in the EIR cannot be guaranteed." Both prior to and at the Commission's hearing, Native Sun presented written and oral comments addressing this issue, as well as the other issues of concern.

At the February 26, 1991, hearing, the Commission concurred with staff's recommendation to deny the project. The Commission's decision was based, in part, on Final EIR 89-55's identification of significant unmitigated cumulative impacts of the project and on staff's statements that the funding and construction of public improvements and facilities "is beyond the scope of this project and is not considered feasible until such time as the North Broadway Subarea Facilities Plan is prepared."

The development agreement contains provisions committing Native Sun to pay its reasonable fair share of any subarea facilities fees imposed by the North Broadway Subarea Facilities Plan (SFP)—if and when it is adopted. The development agreement also obligates Native Sun to pay any subarea facilities fees over the 10-year term of that agreement.

On April 3, 1991, the Council held a public hearing to consider the proposed project and Final EIR 89-55. This hearing was continued to April 17, 1991. Prior to the April 17, 1991, hearing, Native Sun hand-delivered two letters to the City, setting forth factual and legal reasons why the Council should approve the 102-unit project. On the afternoon of the hearing, Native Sun received a memorandum to the mayor and Council members from Charles D. Grimm, director of planning and building. According to Mr. Grimm, the "purpose" of the memorandum was to summarize the "basis" of the staff and the Commission recommendation to deny the project "in light of questions raised in the 4/8/91 correspondence from the applicant's attorney." In that memorandum, Mr. Grimm advised the mayor and the Council members that the "EIR and the Commission recommendation are predicated on the assumption that timing restrictions are in fact necessary until it can be demonstrated that sufficient facilities are available to avoid further compounding of deficiencies," and that the financing plan for the SFP "will provide for the provision" of the needed mitigation measures; but that, in the absence of the SFP, "the extent and feasibility of the necessary improvements cannot be determined. Therefore, the timing of the applicant's project should be controlled until such time that sufficient improvements are provided."

On April 17, 1991, the Council held the final public hearing to consider the project and Final EIR 89-55. At that hearing, the Council concluded that

Final EIR 89-55 "adequately" addressed all of the environmental issues of the project, and denied the project.

On May 1, 1991, the Council adopted a resolution denying Native Sun's proposed modifications to the previously approved tentative map. As earlier noted, the Council did not adopt findings supporting its decision to deny Native Sun's proposed master development plan, precise development plan or development agreement.

Native Sun filed a petition for writ of mandate and complaint against the City on May 22, 1991. An amended petition for writ of mandate and complaint was filed on October 8, 1991. The amended petition alleges, inter alia, a claim based on the City's violation of CEQA and two claims based on the City's violation of the Subdivision Map Act.

On December 20, 1991, Native Sun's CEQA and Subdivision Map Act claims were heard. On March 12, 1992, the trial court issued a statement of decision denying Native Sun's request for relief on its CEQA and Subdivision Map Act claims and granting judgment in favor of the City with respect to those claims.

On March 23, 1992, Native Sun filed a motion for reconsideration of the trial court's decision. In the motion, Native Sun requested that, among other things, the trial court reconsider its decision that the development agreement was, in fact, discussed in the Final EIR.

On April 24, 1992, the court issued an "Order on Application for Reconsideration" granting Native Sun's application for reconsideration. The trial court reversed a part of its holding by noting that the development agreement was not analyzed in the Final EIR. However, the trial court confirmed its prior ruling that it was not necessary for the Final EIR to analyze the development agreement because "CEQA does not require that an analysis be made of each and every activity carried out in conjunction with a project."

DISCUSSION

I

 Initially, we determine Native Sun's CEQA claims attacking the adequacy of the EIR, having in mind the following precepts set forth in *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 563-564 [276 Cal.Rptr. 410, 801 P.2d 1161]:

"As we recently observed in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764

P.2d 278] (*Laurel Heights*): 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' (*Id.* at p. 390, quoting *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

■ "The EIR has been aptly described as the 'heart of CEQA.' (Guidelines, § 15003, subd. (a); *Laurel Heights, supra*, 47 Cal.3d at p. 392; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

■ "In reviewing agency actions under CEQA, Public Resources Code section 21168.5 provides that a court's inquiry 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' Thus, the reviewing court ' "does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." ' (*Laurel Heights, supra*, 47 Cal.3d at p. 392, quoting *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. 'Our limited function is consistent with the principle that "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' (47 Cal.3d at p. 393, quoting *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].) We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (Fn. omitted.)

■ Native Sun contends the new EIR, Final EIR 89-55, omits discussion of obvious and feasible mitigation measures, and thus a reversal of the trial court's judgment is required. Native Sun cites section 21100, subdivision (c), reading in part, that an EIR "shall include a detailed statement setting forth . . . [¶] [m]itigation measures proposed to minimize the significant

environmental effects . . ." of a proposed project. Native Sun also cites Guidelines section 15126, subdivision (c), which states that the EIR should "[d]escribe measures which could minimize significant adverse impacts . . . . The discussion of mitigation measures shall distinguish between the measures which are proposed by project proponents to be included in the project and other measures that are not included but could reasonably be expected to reduce adverse impacts if required as conditions of approving the project. This discussion shall identify mitigation measures for each significant environmental effect identified in the EIR. . . ." Native Sun points out the Legislature has declared that public agencies should identify not only significant effects of proposed projects, but also "feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (§ 21002.)

We point out the thrust of section 21002 and the following section, 21002.1, is a concern that *approval* of an EIR for a project should include an examination of feasible mitigation measures.[4] Those sections, by their terms, do not directly involve a situation such as the one before us, where the public agency has disapproved the project based on the EIR. In this connection *Main San Gabriel Basis Watermaster* v. *State Water Resources Control Bd.* (1993) 12 Cal.App.4th 1371, 1380 [16 Cal.Rptr.2d 288], states in part:

"[T]he requirement of an EIR is not even triggered unless a public agency *proposes to carry out or approve* a project which may have a significant

---

[4]More fully, section 21002 provides: "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof."

Section 21002.1 provides in part: "In order to achieve the objectives set forth in Section 21002, the Legislature finds and declares that the following policy shall apply to the use of environmental impact reports prepared pursuant to this division:

"(a) The purpose of an environmental impact report is to identify the significant effects of a project on the environment, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided.

"(b) Each public agency shall mitigate or avoid the significant effects on the environment of projects it approves or carries out whenever it is feasible to do so.

"(c) In the event that economic, social, or other conditions make it infeasible to mitigate one or more significant effects of a project on the environment, the project may nonetheless be approved or carried out at the discretion of a public agency, provided that the project is otherwise permissible under applicable laws and regulations."

effect on the environment. Any lingering doubt about the Legislature's intent is expunged by Public Resources Code section 21080, subdivision (b)(5), which expressly declares that CEQA *does not apply* to '[p]rojects which a public agency rejects or disapproves.' Section 15270, subdivision (a) of the CEQA Guidelines (Cal. Code Regs., tit. 14) echoes subdivision (b)(5) of Public Resources Code section 21080, stating: 'CEQA does not apply to projects which a public agency rejects or disapproves.' " (Italics in original.)

The City observes that Guidelines section 15042 specifically provides authority for a public agency to "disapprove a project . . . in order to avoid one or more significant effects on the environment that would occur if the project were approved as proposed." The definition of "mitigation" includes "[a]voiding the impact altogether by not taking a certain action or parts of an action." (Guidelines, § 15370, subd. (a).) Moreover, Guidelines section 15002, subdivision (h)(5), provides in part:

"The EIR by itself does not control the way in which a project can be built or carried out. Rather, when an EIR shows that a project could cause substantial adverse changes in the environment, *the governmental agency must respond* to the information *by* one or more of the following methods . . . . [¶] . . . [*d*]*isapproving the project.*" (Italics added.)

Thus, there can be no doubt as to the authority, if not the duty, of the governmental agency to disapprove a project where an EIR—otherwise supported by substantial evidence—shows there are significant, unmitigated adverse environmental effects.

Native Sun challenges the EIR's conclusion that construction of the proposed project "represents a significant visual impact" because "[t]his proposed residential subdivision would introduce a Planned Development which in terms of building materials and layout is inconsistent with the existing rural residential neighborhood to the north . . . ." Native Sun points out this conclusion is apparently based on the project's lot sizes and exterior building materials utilized in the project design. Yet, Native Sun points out, the EIR fails to identify any mitigation measures to lessen or avoid this impact. This failure to identify mitigation measures for the visual/aesthetic impact occurred even though City's director of planning and building, Charles D. Grimm, in an April 16, 1991, report to the Council recommending denial of the project recognized "[m]easures such as reduced unit size, more one story units, greater unit separations, and alternate materials and colors are possible which would further reduce the visual impacts." City staff also stated, "Since all but the substitution of two story units would

lead to a redesign, they were not listed as a mitigation measure." In a similar letter of April 3, 1991, Grimm stated, "With the exception of the visual/aesthetic impacts (which could be addressed through design modifications as part of the Precise Development Plan review), the significant environmental impacts will ultimately be addressed in the Subarea Facilities Plan."

A second ground Native Sun urges as a basis for overturning the EIR is the failure of the EIR to discuss the development agreement as mitigation for the identified cumulative impacts of traffic, police service, schools, libraries and solid waste. In its opening brief, Native Sun asserts this omission constitutes a "failure to proceed in a manner required by law." (§ 21168; Code Civ. Proc., § 1094.5, subd. (b); see *Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 428 [222 Cal.Rptr. 247].) The development agreement provision on which Native Sun relies provides:

"L. City will permit Developer to proceed with the project prior to the implementation of the North Broadway Subarea Facilities Plan. Owner shall pay its fair share of fees imposed on new development pursuant to the North Broadway Subarea Facilities Plan when such fees are determined, or on any such later date pursuant to the terms of the North Broadway Subarea Facilities Plan. In the event that such fees have not been determined prior to the completion of any phase of the Project, Certificates of Occupancy shall be issued and units may be sold and occupied subject to owner's agreement to pay Subarea Facilities fees at such time as such fees are determined and are payable. . . ."

The development agreement also obligates Native Sun to pay any subarea facility fees over the 10-year term of the agreement.

The rules with respect to incorporating mitigation measures into an EIR include the rule that they: "are suggestions which may or may not be adopted by the decisionmakers. There is no requirement in CEQA that mitigation measures be adopted. The adoption of mitigation depends, among other matters, upon economic and technological feasibility and practicality. (CEQA Guidelines . . . § 15121.)" (*No Slo Transit, Inc.* v. *City of Long Beach* (1987) 197 Cal.App.3d 241, 256 [242 Cal.Rptr. 760].)

Under CEQA the choice of how to allocate mitigation of cumulative impacts remains discretionary with the local entity. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1527 [258 Cal.Rptr. 267].)

Under these rules the conclusion follows that the City was not required to adopt the particular mitigation measures which Native Sun cites. The record

here shows that those measures were considered and, as in *No Slo Transit, Inc. supra*, that was sufficient.

II

Native Sun contends reversal is required because the new EIR fails to discuss the development agreement even though it is a part of the project description. On Native Sun's motion for reconsideration, the trial court reversed its initial decision stating that the development agreement was discussed to some extent in the EIR. Instead, the court agreed that the development agreement was not addressed in the EIR but it found "it was not necessary for the development agreement to be analyzed in the environmental impact report since CEQA does not require that an analysis be made of each and every activity carried out in conjunction with a project." Native Sun contends this determination conflicts with CEQA, the Guidelines and relevant case law. Native Sun's argument has no merit.

It is true that the project description has been viewed as "the '*sine qua non* of an informative and legally sufficient EIR.'" (*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1454 [263 Cal.Rptr. 340], quoting *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-193 [139 Cal.Rptr. 396].) Moreover, CEQA defines "project" broadly to mean "the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . [¶] [t]he term . . . refers to the activity which is being approved. . . ." (Guidelines, § 15378, subds. (a) and (c).)

Native Sun acknowledges that the EIR makes reference to the development agreement. The EIR points out that the development agreement is being requested in addition to the (1) master development plan to reduce the density from 222 units to 102 units and (2) the precise development plan for detailed design of the project. It is apparent from the record that approval of the EIR as well as the three additional documents was being considered as a package of four separate documents for purposes of approval or disapproval.

Under these circumstances, it is clear that the EIR's straightforward reference to the development agreement alerted persons interested in that document to its relevance in the decisionmaking process. Certainly, the decision makers were fully aware of the contents of the various documents. Native Sun contends there was an inadequate description of the project due to the absence of an analysis of the development agreement in the EIR; however, this contention ignores the fact that CEQA, as the trial court stated, does not require an analysis in the EIR of each and every activity carried out

in conjunction with a project.[5] Here, the EIR gave adequate notice of the existence of the development agreement and provided a means for determining the terms of that document. The project description in the EIR was adequate with respect to the development agreement. We note that no case cited by Native Sun holds that an EIR is defective for its failure to analyze a development agreement being proposed in connection with the project. We conclude, as did the trial court, the EIR "adequately apprise[s] all interested parties of the true scope of the project for intelligent weighing of the environmental consequences of the project." (*City of Santee, supra,* 214 Cal.App.3d at pp.1454-1455.)

### III

Native Sun contends the City failed to adopt legally required findings to support denial of modifications to the proposed master development plan, precise development plan and development agreement. Native Sun contends the City's decision on these three documents was adjudicative in nature, rather than legislative, and thus findings were required. (See *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 513-514 [113 Cal.Rptr. 836, 522 P.2d 12] [pertaining to adoption of a zoning variance].) The contention is without merit.

The nature and effect of the three documents at issue is analogous to a planned unit development which imposes a special zoning on property. (See *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 796 [132 Cal.Rptr. 386, 553 P.2d 546]; see also *Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 245 [69 Cal.Rptr. 251].) It is the settled law of this state "that zoning ordinances, whatever the size of the parcel affected, are legislative acts." (*Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 514 [169 Cal.Rptr. 904, 620 P.2d 565].) Legislative acts, of course, do not require findings. (See *Ensign Bickford Realty Corp.* v. *City Council* (1977) 68 Cal.App.3d 467, 473 [137 Cal.Rptr. 304].)

Our conclusion that consideration of the three documents in question involved a legislative determination is fortified by Government Code section 65867.5, dealing with development agreements, which specifically states: "A development agreement is a legislative act which shall be approved by ordinance and is subject to referendum." Under this statute, there can be no question that the development agreement in question is a legislative act.

---

[5]The Guidelines include a requirement that the description of the project include a list of the approvals for which the EIR will be used. (Guidelines, § 15124, subd. (d)(1)(B).) There is no question the EIR in question comports with this requirement.

We conclude no findings were required in connection with the denial of the modifications to the proposed master development plan, precise development plan and development agreement.

## IV

██ Native Sun contends the City's decision to deny the project constitutes a development moratorium under Government Code section 66452.6 which provides in part:

"(f) . . . [A] development moratorium shall . . . be deemed to exist . . . for any period of time during which a condition imposed by the city or county could not be satisfied because . . . [¶] (1) [t]he condition was one which, by its nature, necessitated action by the city or county, and the city or county either did not take the necessary action or by its own action or inaction was prevented or delayed in taking the necessary action prior to expiration of the tentative map."

Native Sun's theory is the moratorium arises from the condition imposed by the City to prepare, complete and adopt the SFP and related financing plan prior to approval of Native Sun's project. There is no question that City has imposed such a condition, which is dependent on *City's* completion of the SFP, or that City has not completed the SFP.

City's position, accepted by the trial court, is that the SFP condition applies only to the *modification* of the tentative map, not to the originally approved map, and thus no moratorium extends the life of the original map. Under the circumstances of this case, we do not believe the SFP condition is so limited.

On the record before us, it is clear the City affirmatively prevented Native Sun from processing a final map for the 222 units on the property based on the original approved tentative map. Native Sun then engaged in good faith negotiations with the City leading up to the proposal for a 102-unit project. The substituted proposal, including the SFP condition, was an integral part of City's action in preventing the processing of the final map based on the original approved tentative map. In the interim, the City approved a development moratorium tolling the expiration of the original map and adopted a growth management ordinance which generally prevents development in reliance on prior approvals unless the project establishes conformance with the SFP and provisions of the growth management ordinance. (City Ord. No. 90-62.) City's Ordinance No. 90-62 provides, in part:

"SECTION 4. Except for development exempted by SECTIONS 6 and 7, applications for new residential, . . . in Tiers 2A . . . shall include, without

limitation, an approved Subarea Facility Plan. *No application* for such a project *shall be accepted for processing* in Tier 2A . . . until a Subarea Facility Plan has been adopted. Once said plan is adopted, applications may commence providing they are processed concurrently with supplemental analyses documenting conformance with the Subarea Facility Plan." (Italics added.)

The ordinance was adopted November 28, 1990, a little more than four and one-half months before the friendly moratorium was to expire on April 18, 1991. Under the ordinance, Native Sun could not fulfill the condition of the original approved tentative map to submit an application for a precise development plan in order to obtain its final map. (See Gov. Code, § 66474.1; see also *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 652, 655-656 [150 Cal.Rptr. 242, 586 P.2d 556]; *Kriebel* v. *City Council* (1980) 112 Cal.App.3d 693, 703 [169 Cal.Rptr. 342].)[6] This is because City had not adopted an approved SFP for tier 2, which includes the development here in question. Thus, under the ordinance, City could not accept for processing the precise development plan that Native Sun was required to do under the original approved tentative map. These facts fulfill the elements of a moratorium under Government Code section 66452.6, subdivision (f)(1).

What is the life of the statutory moratorium?[7] The question must be answered in the context of the legislative purpose expressed in Government Code section 66452.6 to establish a maximum life for an approved or conditionally approved tentative map. It also must be answered in the context of the particular facts of this case involving good faith efforts to effect a modification of the tentative map, made while an agreed upon friendly moratorium existed, followed by a disapproval of the modification.

Under Government Code section 66452.6 the maximum life of a tentative map is the term prescribed by subdivision (a), not to exceed 10 years, extended by tolling and extension provisions in later subdivisions. Not considering any tolling due to lawsuits as provided for in subdivisions (b)(2) and (c) of Government Code section 66452.6, subdivision (a) of the section commences by providing:

"An approved or conditionally approved tentative map shall expire 24 months after its approval or conditional approval, or after any additional

---

[6] Previously approved tentative map condition No. 11 reads: "This approval applies to the Preliminary and Master Concept Plans only. *A Precise Development Plan clearly defining and detailing all details necessary for construction must be submitted to and approved prior to issuance of any permits.* This plan shall include, but not be limited to, the information concerning all buildings, accessory structures, landscaping, public improvements, lighting, recreation facilities, fences and walls, and grading." (Italics added.)

[7] We have received additional briefing on a question related to this issue.

period of time as may be prescribed by local ordinance, not to exceed an additional 12 months."

However, the subdivision provides for extensions under certain conditions and specifies that these "extensions shall not extend the tentative map more than 10 years from its approval or conditional approval." (Gov. Code, § 66452.6, subd. (a).)

Government Code section 66452.6, subdivision (b) provides for the moratorium of five years, plus possibly 120 days, as follows:

"(1) The period of time specified in subdivision (a), including any extension thereof granted pursuant to subdivision (e), shall not include any period of time during which a development moratorium, imposed after approval of the tentative map, is in existence. However, the length of the moratorium shall not exceed five years.

"

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(3) Once a development moratorium is terminated, the map shall be valid for the same period of time as was left to run on the map at the time that the moratorium was imposed. However, if the remaining time is less than 120 days, the map shall be valid for 120 days following the termination of the moratorium."

Government Code section 66452.6, subdivision (e) permits local authorities to extend the life of the tentative map for an additional period to that set forth in subdivision (a), but not exceeding three more years. The subdivision (e) extension is authorized upon timely application of the subdivider before expiration of the approved or conditionally approved tentative map.

Here, since Native Sun was protected by the friendly moratorium put into effect in November 1989 and agreed to continue until April 1991, there was no need for Native Sun to assert or rely on a moratorium based on the November 1990 enactment of the growth management ordinance until the modification application was denied and the friendly moratorium expired. This reality does not mean that the statutory moratorium under Government Code section 66452.6, subdivision (f)(1), was not also in effect during the time period commencing with enactment of the ordinance that gave rise to the moratorium. Under the statutory scheme spelling out a variable but limited period of life for an approved or conditionally approved tentative map, and under the circumstances of this case, where the tentative map was still "alive" by virtue of the friendly moratorium at the time the statutory moratorium took effect, we deem it is appropriate to conclude the statutory

five-year moratorium commenced November 28, 1990, when City's Ordinance No. 90-62 was adopted.

We note there are indications in the record that the City Attorney's office and members of City's Commission were of the view that the original map was subject to a moratorium based on the need for a SFP. Our conclusion is consistent with the view expressed by the City officers and employees.

Under all of these circumstances, we conclude a moratorium applies to the original approved tentative map until 120 days following the completion of the SFP condition, but not for a tolling period exceeding 5 years from November 28, 1990. (Gov. Code, § 66452.6, subd. (b)(1).)

## DISPOSITION

The judgment is reversed insofar as it determines the original approved map has expired by virtue of its not being subject to a moratorium. In all other respects, the judgment is affirmed. Native Sun shall recover its costs on appeal.

Kremer, P. J., and Work, J., concurred.

A petition for a rehearing was denied June 8, 1993.