2000 Utah Ct. App. 031

**HARMON CITY, INC., a Utah corporation; and Johansen–Thackery & Company, Inc., a Utah corporation, Plaintiffs and Appellant,**

v.

**DRAPER CITY, a municipal corporation; and Does I–100, Defendants and Appellees.**

No. 981628–CA.

Court of Appeals of Utah.

Feb. 10, 2000.

James A. Boevers and Thomas R. Barton, Prince, Yeates & Geldzahler, Salt Lake City, for Appellant.

Jody K. Burnett, Williams & Hunt, Salt Lake City, for Appellees.

Before Judges BILLINGS, JACKSON, and ORME.

## OPINION

BILLINGS, Judge:

¶ 1 Harmon City, Inc. (Harmon) challenges the trial court's order granting summary judgment for Draper City (Draper). We affirm.

¶ 2 Harmon bought 10.277 acres (the property) within the Draper city limits. Harmon purchased the property to build a twenty-four hour, 71,700–square–foot grocery store, a 13,300–square–foot drug store, and a 16,500–square–foot "in-line tenant space." When Harmon bought the property, it was zoned RR–43 for residential/agricultural use. Although the property fell within an area designated for mixed use in Draper's General Plan, Harmon's project was not compatible with the RR–43 zoning classification.

¶ 3 Therefore, in November, 1997, Harmon applied to Draper asking that the property

be rezoned to C–2,[1] under which the property would fall within a "neighborhood commercial district."[2] Harmon supplemented its application with documentation by experts in land development. Harmon submitted its application to the Draper Planning Commission, which considered Harmon's request and ultimately recommended that the city council approve it.

¶ 4 On February 3, 1998, the city council considered Harmon's application. The council heard comments from a Harmon representative, the planning commission, and interested citizens. Many of the comments were positive, however, some citizens expressed concern about having a large, twenty-four-hour grocery store in the primarily residential neighborhood because of the increased traffic and other safety concerns. After considering the planning commission's recommendation, as well as comments from the public, the city council voted to deny Harmon's requested zoning reclassification from RR–43 to C–2.

¶ 5 On March 4, 1998, Harmon filed an appeal in the district court. Both sides moved for summary judgment based on the record created before the city council. In its decision granting summary judgment for Draper, the trial court, with our emphasis, stated, "So long as it is *reasonably debatable* that it is in the interest of the general welfare, this Court will uphold the city's zoning decision." The court noted that it was "satisfied that there is sufficient basis in the record to support Draper City Council's denial of plaintiff's application for rezoning. Accordingly, the court cannot find that the city council's action was arbitrary, capricious, or illegal."

¶ 6 Harmon appeals, arguing that the trial court incorrectly relied on the "reasonably debatable" standard of review. Harmon argues that the trial court should have applied the "substantial evidence" standard, and that, under that standard, the court should have concluded that there was not substantial evidence to support the council's denial of the rezoning application. Harmon thus asks that we reverse the trial court's decision.

### ANALYSIS

¶ 7 When reviewing a city council's decision not to change the zoning classification of property, we presume that the decision is valid and "determine only whether or not the decision is arbitrary, capricious, or illegal." Utah Code Ann. § 10–9–1001(3) (1999).[3] At issue is the meaning of arbitrary and capricious in the context of Draper's decision not to change the zoning classification of the property. This is a legal issue which we review for correctness. *See Springville Citizens for a Better Community v. City of Springville*, 1999 UT 25, ¶ 22, 979 P.2d 332.

### I. The Arbitrary and Capricious Standard

¶ 8 Judicial review of land use decisions by municipalities and counties has al-

---

1. The stated purpose of the proposed C–2 Neighborhood Commercial District is:

   To provide areas, in appropriate locations where convenience buying outlets may be established to serve surrounding residential neighborhoods. The regulations of this district are designed to promote a combination of retail and service facilities, which in character and scale, are necessary to meet day-to-day needs of area residents.

   Staff Report to Draper Planning Commission, Draper Gateway Zone Change and Conditional Use Permit, at 2 (Jan. 2, 1998).

2. Concurrent with its rezoning application, Harmon also applied for a conditional use permit. At the time the planning commission voted to recommend that the city council approve the rezoning request, the commission also voted to approve the conditional use permit. During the

meeting at which the city council considered the rezoning, an appeal of the planning commission's approval of the conditional use permit was also on the agenda. However, when the city council rejected the rezoning request, the council declined to consider the appeal of the conditional use permit because the permit depended on the rezoning.

3. "Although [section 10–9–1001] expressly applies only to the district court, 'the standard for our review . . . is the same standard established in the Utah Code for the district court's review.'" *Brown v. Sandy City Bd. of Adjustment*, 957 P.2d 207, 210 n. 5 (Utah Ct.App.), *cert. denied*, 982 P.2d 88 (Utah 1998) (quoting *Patterson v. Utah County Bd. of Adjustment*, 893 P.2d 602, 603 (Utah Ct.App.1995)); *see also Springville Citizens for a Better Community v. City of Springville*, 1999 UT 25, ¶ 22, 979 P.2d 332.

ways been limited in this state to some formulation of the arbitrary, capricious, or illegal standard.[4] However, the deference that we have historically granted to land use decisions under this standard has varied depending on whether the decision-making body is acting in a legislative capacity or an administrative/adjudicative capacity.[5]

¶ 9 In addressing the issues presented here, it is important to recognize that the enactment and amendment of zoning ordinances is fundamentally a legislative act.[6] Review of a municipality's legislative action has always been highly deferential in Utah. In *Marshall v. Salt Lake City*, for example, plaintiffs challenged a city's legislative enactment of a zoning ordinance dividing the city into districts and specifying permitted uses within districts. *See* 105 Utah 111, 141 P.2d 704, 705–06 (1943). The trial court granted judgment against the city, but the supreme court reversed, stating that it would uphold the zoning ordinance "if it *could* promote the general welfare; or even if it is *reasonably debatable* that it is in the interest of the

general welfare." *Id.* at 709 (emphasis added).

¶ 10 The court enunciated a similarly deferential meaning of "arbitrary" in *Dowse v. Salt Lake City Corp.*, 123 Utah 107, 255 P.2d 723 (1953). In *Dowse*, a case factually similar to the present case, Salt Lake City had denied a landowner's petition to rezone his property from residential to commercial. *See id.* at 723. The landowner sued to have the city's decision reversed, but the district court dismissed the landowner's complaint. *See id.* at 723–24. The supreme court affirmed, noting that the city's denial of the rezone application was not arbitrary even if, as the landowner alleged, other blocks in the neighborhood were zoned commercial and the property was located in an area unsuitable for residential use. *See id.* at 724. " 'This is essentially a legislative problem, and the determination may be attacked only if there is *no reasonable basis therefor.*' " *Id.* (emphasis added) (quoting *Phi Kappa Iota Fraternity v. Salt Lake City*, 116 Utah 536, 212 P.2d 177, 181 (1949) (quoting *Wilkins v. City of San Bernardino*, 29 Cal.2d 332, 175 P.2d 542, 549 (1946))).[7]

---

4. *See, e.g., Xanthos v. Board of Adjustment of Salt Lake City*, 685 P.2d 1032, 1035 (Utah 1984) (reviewing decision by board of adjustment under arbitrary and capricious standard); *Gayland v. Salt Lake County*, 11 Utah 2d 307, 358 P.2d 633, 636 (1961) ("[I]t is the court's duty ... not to interfere with the Commission's action unless it ... capriciously and arbitrarily infringes upon [property] rights."); *Marshall v. Salt Lake City*, 105 Utah 111, 141 P.2d 704, 709 (1943) ("Unless the action of such body is arbitrary, discriminatory or unreasonable, or clearly offends some provision of the constitution or statute, the court must uphold it.").

5. *Compare Marshall*, 141 P.2d at 709 (stating, in reviewing a legislative zoning action: "If a [zoning] classification is *reasonably doubtful*, the judgment of the court will not be substituted for the judgment of the city." (emphasis added)), *with Xanthos*, 685 P.2d at 1035 (stating that, in reviewing a board of adjustment's adjudicative action: "[The trial court's] role was limited to determining whether there was *evidence in the record* to support the Board of Adjustment's action." (emphasis added)).

6. *See Sandy City v. Salt Lake County*, 827 P.2d 212, 221 (Utah 1992); *see also Scherbel v. Salt Lake City Corp.*, 758 P.2d 897, 899 (Utah 1988) ("the passage of general zoning ordinances and the determination of zoning policy [are] properly vested in the legislative branch."); *Gayland*, 358

P.2d at 635–36 ("In pursuing its authority to zone, ... the Commission is performing a legislative function."). Additionally, the legislative process is inherently political in nature and requires a legislative body to broadly weigh the interests of all concerned in furtherance of the general welfare. *See, e.g., Marshall*, 141 P.2d at 709–10 (noting varied interests considered in creating zoning plan).

7. In *Walker v. Brigham City*, 856 P.2d 347 (Utah 1993), the supreme court said that a municipality's legislative decision would be upheld under the arbitrary and capricious standard unless "wholly discordant to reason and justice." *Id.* at 349. In *Crestview–Holladay Homeowners Ass'n v. Engh Floral Co.*, 545 P.2d 1150 (Utah 1976), the supreme court, reviewing a challenge to a rezoning by the Salt Lake County Commission, observed that "[i]n the review of zoning cases the function of the court is narrow and its scope is limited to a determination of whether or not the action of the Board of County Commissioners as a legislative body is illegal, arbitrary, or capricious." *Id.* at 1151–52. The court deferred to the legislative body and upheld the rezoning as enacted "pursuant to a planning scheme developed for that portion of the county." *Id.* at 1152. The supreme court likewise upheld a rezoning, this one passed by a municipality's legislative body, in *Naylor v. Salt Lake City Corp.*, 17 Utah 2d 300, 410 P.2d 764 (1966). In *Naylor*, the

¶ 11 In another case strikingly similar to the present one, a corporation sought to develop a shopping center on undeveloped land in Salt Lake County. *See Gayland v. Salt Lake County*, 11 Utah 2d 307, 358 P.2d 633, 634 (1961). To develop the shopping center, the corporation needed to have the property's zoning classification changed from residential to commercial. *See id.* Although the county's planning commission recommended that the county commission (the county's legislative body) adopt the proposed zoning classification amendment, the county commission voted to deny the corporation's application after a public hearing. *See id.* at 634–35. The corporation sued the county in district court seeking to have the court compel the county to adopt the corporation's application for the zoning reclassification. *See id.* The trial court entered judgment for the corporation and ordered the county to adopt the zoning amendment. *See id.* at 634.

¶ 12 The supreme court reversed, reviewing the county's decision under the arbitrary and capricious standard. On the arbitrary and capricious standard, the *Gayland* court said:

> In zoning, as in any legislative action, the functioning authority has wide discretion. *Its action is endowed with a presumption of validity;* and it is the court's duty to resolve all doubts in favor thereof and not to interfere with the Commission's action unless it clearly appears to be beyond its power; or is unconstitutional for some such reason as it deprives one of property without due process of law, or *capriciously and arbitrarily* infringes upon his rights therein, or is unjustly discriminatory.

*Id.* at 636 (citations omitted; emphasis added).

¶ 13 The *Gayland* court applied a standard of review essentially identical to that currently provided by statute: "The courts shall: (a) presume that land use decisions and regulations are valid; and (b) determine only whether or not the decision is arbitrary, capricious, or illegal. Utah Code Ann. § 10–9–1001(3) (1999).

¶ 14 We conclude that the 1991 enactment of section 10–9–1001(3), which largely codifies the case law cited above, did not alter the deferential review of a municipality's legislative zoning classification decisions under the arbitrary and capricious standard. *See, e.g., Smith Inv. Co. v. Sandy City*, 958 P.2d 245, 252 (Utah Ct.App.1998) ("[I]f an ordinance 'could promote the general welfare[,] or even if it is reasonably debatable that it is in the interest of the general welfare' we will uphold it." (citations omitted)).

¶ 15 We conclude that the Utah Legislature did not adopt a one-size-fits-all standard of review for legislative and administrative/adjudicative functions when it codified the "arbitrary, capricious, or illegal" language of section 10–9–1001. The Legislature uses "arbitrary and capricious" to define both review of adjudicative actions by a board of adjustments, *see* Utah Code Ann. § 10–9–708(2) (1999) ("[T]he plaintiff may only allege that the board of adjustment's decision was arbitrary, capricious, or illegal."), and review of legislative actions of a municipality, *see id.* § 10–9–1001(3). However, the Legislature has provided for judicial review under the substantial evidence standard only for adjudicative functions. *See id.* § 10–9–708(6) ("The court shall affirm the decision of the board of adjustment if the decision is supported by substantial evidence in the record."). These different standards of review, both described generally as arbitrary and capricious, exactly mirror the case law prior to the 1991 statutory enactment.[8]

¶ 16 Harmon cites a number of cases to support its argument that we should review the Draper City Council's legislative zoning decision under the substantial evidence standard. However, those cases are inapposite

---

court stated that the city's action was not arbitrary and capricious unless "there is no reasonable basis whatsoever to justify it." *Id.* at 766.

8. *See, e.g., Xanthos*, 685 P.2d at 1035 (court's role under arbitrary and capricious standard is "determining whether there was evidence in the record to support the Board of Adjustment's ac-

tion"); *Davis County v. Clearfield City*, 756 P.2d 704, 708 n. 5, 711 (Utah Ct.App.1988) (where city council sits as a board of adjustment, decision to deny conditional use permit is arbitrary where reasons for denial lack sufficient factual basis).

in that each involves a municipality acting in an administrative quasi-judicial capacity. Moreover, the bulk of those cases address decisions of a board of adjustment.[9] The distinction between quasi-judicial decisions of a board of adjustment as opposed to legislative municipal zoning decisions is significant: boards of adjustment have no legislative powers and are not permitted to have those powers. *See Sandy City v. Salt Lake County*, 827 P.2d 212, 220 (Utah 1992); *Salt Lake County Cottonwood Sanitary Dist. v. Sandy City*, 879 P.2d 1379, 1383 (Utah Ct.App.1994).

¶ 17 In light of the case law prior to the 1991 enactment of the current zoning statute, we read sections 10–9–1001 and 10–9–708 as embracing the historical distinction between administrative and legislative functions for the purpose of judicial review. We therefore conclude that the district court properly applied the "reasonably debatable" standard of review in this case.

¶ 18 We also reach this conclusion because the distinction between a municipality's legislative and administrative functions rests on an important principle: It is a legislative body's prerogative to determine public policy, a judicial body's job to interpret the policy, and an administrative body's job to enforce the policy. Establishing zoning classifica-

tions reflects a legislative policy decision with which courts will not interfere except in the most extreme cases. Indeed, we have found no Utah case, nor a case from any other jurisdiction, in which a zoning classification was reversed on grounds that it was arbitrary and capricious.

¶ 19 The dissent suggests that, for purposes of judicial review, our supreme court abandoned the distinction between the legislative and administrative acts of a municipality in *Springville Citizens for a Better Community v. City of Springville*, 1999 UT 25, 979 P.2d 332. In *Springville Citizens*, the court stated: "A municipality's land use decision is arbitrary and capricious if it is not supported by substantial evidence." *Id.* at ¶ 24 (citation omitted). We conclude that the supreme court did not intend, with that broad statement, to abandon the case law cited above. We are not convinced, from reviewing the facts relied on by the court in its opinion, that the supreme court was reviewing in *Springville Citizens* what it viewed as a legislative act.[10]

¶ 20 First, the plaintiffs in *Springville Citizens* sought judicial review of the city's decision to approve a planned unit development (PUD) rather than reclassification of the zoning district. *See id.* at ¶¶ 2–10.[11] Second,

9. For example, *Brown v. Sandy City Board of Adjustment*, 957 P.2d 207 (Utah Ct.App.1998), reviews a municipal board of adjustment's administrative interpretation of the municipality's zoning ordinance. *See id.* at 208. Likewise, *Wells v. Board. of Adjustment of Salt Lake City Corp.*, 936 P.2d 1102 (Utah Ct.App.1997), reviews a board of adjustment's decision denying a zoning variance. *See id.* at 1103; *see also First Nat'l Bank of Boston v. County Bd. of Equalization of Salt Lake County*, 799 P.2d 1163, 1164 (Utah 1990) (reviewing administrative evaluation for property tax purposes); *Chambers v. Smithfield City*, 714 P.2d 1133, 1134 (Utah 1986) (reviewing administrative procedures for processing zoning variance requests); *Xanthos*, 685 P.2d at 1033 (reviewing board of adjustments' denial of zoning variance); *Patterson*, 893 P.2d at 603 (reviewing county board of adjustment's approval of special exception to zoning ordinance); *Davis County*, 756 P.2d at 705 (reviewing city council's denial of conditional use permit).

10. f the *Springville Citizens* decision represented the clear departure from prior precedent that is claimed in the dissent, even if that departure were necessitated by legislative enactment, it would be extraordinary, indeed, for the court not

to say so and to explain in some detail why such an unprecedented result was in order. We find it instructive that there is no such discussion in the opinion.

11. The dissent suggests that *Springville Citizens* involved a zoning reclassification because part of the land at issue in that case was zoned RA–1–20,000, a classification permitting only residential and agricultural uses. The remainder of the land was classified H–1. In its slip opinion, the district court surmised that the developers chose to develop the land as a PUD rather than a subdivision because, under its present classification, land zoned H–1 could be developed as a PUD but not as a subdivision. *See Springville Citizens for a Better Community v. City of Springville*, No. 960400547, slip op., at 3–4 & n. 6 (Dist.Ct.Utah Sept. 5, 1997). Thus the H–1 zoning classification was more restrictive than the RA–1–20,000 classification; the latter could have been developed as either a PUD or a subdivision, but the former could be developed only as a PUD. The developer therefore did not require a new zoning classification but rather required approval for the proposed PUD under the existing zoning classification.

the plaintiffs in *Springville Citizens* argued that the PUD approval was arbitrary and capricious because the city failed to follow its own mandatory ordinances. *See id.* at ¶ 19. Those ordinances limited the discretion of the city council and planning commission by requiring them to consider evidence in particular documents when they made their respective decisions. *See id.* We can discern no claim in *Springville Citizens* that the city's actions were arbitrary and capricious with respect to statutory requirements as opposed to those imposed by ordinance.

¶ 21 We therefore do not believe that *Springville Citizens* controls our decision as to whether Draper's decision not to rezone property was arbitrary and capricious under Utah's zoning statute. That statute places no requirement on a municipality to justify its zoning classifications by substantial evidence.

¶ 22 We recognize that the city council's approval of the PUD in *Springville Citizens* culminated in "adoption of an ordinance amending the City's zoning map." 1999 UT 25, ¶ 2, 979 P.2d 332. Furthermore, we recognize that some authorities, including those cited in the dissent, conclude that PUD approval is a legislative act. We note, however, that those authorities concluding that PUD approval was legislative went on to apply the highly deferential fairly debatable review appropriate to legislative acts.[12]

¶ 23 Moreover, in cases deciding whether PUD approval is legislative or administrative, the distinction is based upon the extent to which a municipality's PUD enabling ordinance limits the municipality's discretion over PUD approval.[13] As noted above, the plaintiffs' claims in *Springville Citizens* were based on the city's ordinances limiting the discretion of the city council and planning commission by requiring them to consider certain information. *See Springville Citizens*, 1999 UT 25, ¶ 19, 979 P.2d 332. Because the supreme court reviewed Springville's actions under the substantial evidence standard, we conclude that the supreme court found the city's discretion limited by its PUD enabling ordinance and therefore viewed the city's actions as administrative. Thus, although the city council of Springville chose to approve the PUD by an ordinance amending its zoning map, *see id.* at ¶ 2, we conclude that this procedure did not change an administrative act into a legislative one.[14]

¶ 24 Finally, we note that the supreme court cited *Patterson v. Utah County Board of Adjustment*, 893 P.2d 602, 604 (Utah Ct. App.1995), for the proposition that approval of the PUD had to be supported by substantial evidence. *See Springville Citizens*, 1999 UT 25, ¶ 24, 979 P.2d 332. *Patterson* involved judicial review of a county board of adjustment's decision, an administrative decision that, by statute, is reviewed under the substantial evidence standard. *See* Utah Code Ann. § 17–27–708(6) (1999). We do not think that the supreme court intended to sweep aside the long-standing distinction between a municipality's legislative and administrative acts by citing to a case controlled by

In any event, in interpreting *Springville Citizens*, we do not think it proper to look beyond the facts relied upon by the supreme court in its published opinion, which makes no reference to either zoning classification.

12. *See, e.g., State ex rel. Helujon, Ltd. v. Jefferson County*, 964 S.W.2d 531, 536 (Mo.Ct.App.1998) (reviewing PUD approval under arbitrary and capricious standard, "meaning ... fairly debatable"); *see also Native Sun/Lyon Communities v. City of Escondido*, 15 Cal.App.4th 892, 19 Cal. Rptr.2d 344, 354 (1993) ("It is the settled law of this state 'that zoning ordinances, whatever the size of the parcel affected, are legislative acts.' *Legislative acts, of course, do not require findings.*" (emphasis added; citations omitted)).

13. *Compare Todd Mart, Inc. v. Town Bd. of Webster*, 49 A.D.2d 12, 370 N.Y.S.2d 683, 689–90 (N.Y.App.Div.1975) (holding PUD approval legis-

lative because municipality's discretion under PUD enabling ordinance was no less broad than its discretion under statute), *with McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990) (holding PUD approval administrative because PUD enabling ordinance limited city council's discretion over PUD approval).

14. We do admit that *Springville Citizens* can reasonably be read otherwise. However, we conclude that, because the nature of the claim in *Springville Citizens* is less than clear, we should read *Springville Citizens'* application of the standard of review as consistent with longstanding Utah common law and as supported by good public policy, rather than as a dramatic break from prior precedent where no such intention is expressed in the opinion.

a statute inapposite to review of legislative zoning decisions.

¶ 25 We conclude that our supreme court did not intend to abandon the deferential "reasonably debatable" standard of review for a municipality's legislative action such as a zoning decision. Absent a clearer command from our supreme court, we decline to require Draper to justify by substantial evidence its purely legislative act of denying a requested change in zoning classification. In sum, we conclude that the district court was correct in using the "reasonably debatable" standard in reviewing the city council's refusal to rezone Harmon's property.

## II.  Public Clamor Doctrine

¶ 26 Next, Harmon argues that its application to rezone the property was denied because the Draper City Council improperly relied on "public clamor." *See Davis County v. Clearfield City,* 756 P.2d 704, 711–12 (Utah Ct.App.1988) (city's decision to deny a conditional use permit arbitrary and capricious where the city relied solely on "public clamor"). In relying on *Davis County,* however, Harmon incorrectly equates review of the administrative decision to deny a conditional use permit with review of a legislative act. Although both actions are reviewed under the arbitrary and capricious standard, a city may rely on the concerns of interested citizens when performing legislative functions. *See Gayland v. Salt Lake County,* 11 Utah 2d 307, 358 P.2d 633, 634 (1961).

¶ 27 In *Gayland,* the court discussed the information that a legislative body may consider when exercising its legislative authority to classify zoning districts:

In support of its contention that the refusal to approve its application was an arbitrary deprivation of its property rights, plaintiff argues that the Commission [i.e., the legislative body] improperly heard, considered and based its determination on

protests and representations voiced by people representing jealous business interests in the general area. *We do not see any impropriety in the Commission receiving and taking into account any information they had to offer bearing on the problem under consideration.*

It is important to keep in mind that such a hearing is not of the same character as a trial, nor even of an administrative hearing or other legal proceeding, and is not limited by formal rules of procedure or evidence as they are. In pursuing its authority to zone the county the Commission is performing a legislative function. It has the responsibility of advising itself of all pertinent facts as a basis for determining what is in the public interest in that regard. For this reason *it is entirely appropriate to hold public hearings and to allow any interested parties it desires to give information and to present their ideas on the matter.* But this is by no means the only source from which the commissioners may obtain such information. From the fact that they hold such public offices it is to be assumed that they have wide knowledge of the various conditions and activities in the county bearing on the question of proper zoning, such as the location of businesses, schools, roads and traffic conditions, growth in population and housing, the capacity of utilities, the existing classification of surrounding property, and the effect that the proposed reclassification may have on these things and upon the general orderly development of the county. In performing their duty *it is both their privilege and obligation to take into consideration their own knowledge of such matters and also to gather available pertinent information from all possible sources* and give consideration to it in making their determination.

*Id.* at 635–36 (emphasis added). As *Gayland* points out, the public clamor doctrine has no application when a legislative body acts in a legislative capacity.[15] We thus conclude that

---

15. Nor should "public clamor" be equated with public comment. "Clamor" is a more subjective term, connoting a degree of irrationality or emotion. *See Webster's Third New Int'l Dictionary* 414 (1993) (defining "clamor" as "the loud and continued uproar of many human voices[;] a loud continued and usu[ally] confused noise").

the Draper City Council was not required to disregard the concerns of its electorate—or its own concerns—when performing in a legislative capacity.

### III. Plaintiff's Burden

■ ¶ 28 As the dissent explains, Harmon presented ample information to the city council that would have justified Harmon's requested change in zoning classification. However, in attacking the city's action, Harmon's burden was not to show that the city council had no reason to deny Harmon's application to rezone the property to commercial. Rather, the burden was on Harmon to show that the city's decision to preserve the status quo, i.e., its decision not to change the zoning classification of the property, was arbitrary, capricious, or illegal. That is, plaintiff had to show that the use of the property for residential purposes could not promote the general welfare. *See Smith Inv. Co. v. Sandy City*, 958 P.2d 245, 252 (Utah Ct.App. 1998) (noting that court will uphold zoning classification if it "could promote the general welfare"). Although Harmon presented evidence to support the position that the proposed rezone was reasonable, the city council, upon the record before it, could have reasonably concluded that use of the property for residential purposes consistent with the current zoning status was entirely appropriate.[16] We therefore affirm the trial

court's decision to uphold this legislative act of the Draper City Council.

### CONCLUSION

¶ 29 The trial court correctly applied the reasonably debatable standard of review to Draper's legislative decision not to change the zoning classification of Harmon's property. We do not doubt that the city would have been justified in relying on the extensive documentation that Harmon presented had it decided to rezone the property. However, Harmon has failed to show that the present zoning of the property for residential use could not promote the general welfare. We therefore affirm the district court's summary judgment in favor of Draper.

¶ 30 I CONCUR: GREGORY K. ORME, Judge.

JACKSON, Judge (dissenting):

¶ 31 I respectfully dissent because I would reverse the trial court's order granting summary judgment for Draper City (Draper).

### ADDITIONAL BACKGROUND

¶ 32 When Harmon City, Inc. (Harmons) bought the property at issue, the property was zoned RR–43 for residential/agricultural use, but was in an area designated by Draper's General Plan for Mixed Use (Planned Development).[1] The property was also to be

---

Its synonyms include hubbub, rumpus, tumult, and din. *See id.*

16. Harmon's argument fails for the additional reason that, through this suit, it seeks to enforce Draper's master plan. By statute, a city's master plan is advisory unless made mandatory by the city. *See* Utah Code Ann. § 10–9–303(6) (1999). Harmon has not argued that the Draper master plan is mandatory and not advisory. We might reach a different conclusion had Draper legislatively limited its discretion in zoning matters by making its master plan mandatory. *Cf. Springville Citizens*, 1999 UT 25, ¶¶ 28–30, 979 P.2d 332 (holding municipality bound to follow its own mandatory ordinances).

1. The General Plan describes Mixed Use (Planned Development) zoning as follows:
   The mixture of uses within this category should include master planned developments consisting of office, light manufacturing, retail, residential, and recreation and open space components. These areas are envisioned as

providing for a compatible mix of residential and non-residential uses in well-planned activity centers, that promote day and evening use. The mix of land uses may vary from location to location. The size of individual projects may vary, however, each development must respect surrounding parcels....

Land Use Element, Draper, Utah, General Plan § 6(a) (1996). The General Plan further states: "Generally, the types of uses encouraged in [Mixed Use] areas include auto dealerships, corporate and speculative offices, lodging facilities, regional commercial centers, clean manufacturing facilities, a variety of residential densities, convention facilities, service retail, movie and live theaters, and other similar activities." *Id.* § 6(c).

The General Plan specifically notes that the area around 700 East and 11400 South "would be appropriate for smaller-scale mix-use development which respects the neighborhood character within the area." *Id.* § 6(b).

part of the "700 East Area Master Plan," which had not yet been formulated.

¶ 33 Harmons supplemented its rezoning application to Draper with the following materials: a study by a certified property appraiser analyzing how neighborhood shopping centers affected the value of surrounding residential areas, a site lighting analysis, sketches of various aspects of the development, a study by a traffic engineer evaluating how the development would affect traffic, several endorsement letters and surveys from citizens living near other Harmons stores, an analysis of estimated economic gains and tax revenues from the development, expert explanations of the differences between neighborhood and regional shopping centers, and documentation of Harmons's charitable support of neighborhood schools.

¶ 34 The Draper Planning Commission (the Commission) prepared a staff report dated January 2, 1998. In recommending that the city council approve the zoning change, the report stated, "The proposed area is master planned as Mixed Use; therefore, the proposed Zoning is consistent with the City's General Plan." The report further opined that "[t]he property, with the proposed conditions of approval, will be able to accommodate the proposed uses, if designed appropriately." Finally, the report listed several conditions that had to be met to receive a conditional use permit for the site.

¶ 35 At a January 8, 1998 meeting, the Commission discussed Harmons's application. A Harmons representative presented the material Harmons had submitted with its application, along with other information— e.g., regarding lighting, landscaping, and buffer zones vis-a-vis the adjacent residential neighborhood—showing the proposed development in a positive way. Several citizens spoke for and against the project. The Commission postponed making a decision on the application until after another meeting two days later to discuss the 700 East Area Master Plan. Then, at its January 13, 1998 meeting, the Commission voted to recommend that the city council grant Harmons's request by adopting C–2 zoning for the property. The Commission stated the vote was supported by "[t]he reasons listed in the Staff Report dated January 2, 1998, which include C–2 zoning is in agreement with the City Master Plan for this area, as well as the 700 East Master Plan."

¶ 36 The Commission then prepared a Staff Report for the City Council, recommending the zoning change and explaining the industry standard criteria upon which a grocery store like Harmons qualifies as a neighborhood use. On February 3, 1998, the city council heard comments from a Harmons representative, the Commission, and a few citizens. The comments were primarily positive, with just a couple citizens arguing that the development would not be compatible with the adjoining homes.

¶ 37 After hearing the comments, the city council voted to deny Harmons's rezoning request, expressing

> concern about a 71,700 square foot, 24–hour store being considered because it is not in harmony with the Neighborhood Commercial useage [sic] of the area; the size and shape of the property is not suited for a complex of the size proposed; and the increased traffic, child and family safety issues which have been raised have not been sufficiently resolved.

One council member "added that on the east side of the street smaller scale commercial has been approved and, if the Council designates this area for C–2 commercial development, too many things are allowed in a C–2 zone that are not compatible with residential neighborhoods."

¶ 38 I agree with Harmons that the trial court incorrectly selected the "reasonably debatable" standard of review to apply in upholding the city council's decision. I believe the trial court should instead have applied the "substantial evidence" standard and concluded the evidence did not meet that standard.

## ANALYSIS

### A. Interpreting Arbitrary and Capricious Standard

¶ 39 Harmons argues the trial court incorrectly selected the law applicable to this case

when it used the reasonably debatable criterion as the arbitrary and capricious standard under Utah Code Ann. § 10–9–1001(3)(b) (1999). Harmons contends that the correct criterion is substantial evidence. I agree.

¶ 40 Before the briefs were submitted in this case, the Utah Supreme Court had already decided this exact issue in *Springville Citizens for a Better Community v. City of Springville*, 1999 UT 25, 979 P.2d 332. I am disconcerted that counsel for both parties elected to completely ignore *Springville Citizens* in their briefing, thus not giving us the benefit of any analysis. Similarly, my colleagues have sought to avoid or wiggle free from the direct precedential effect of *Springville Citizens*. Despite the negative policy implications flowing from that decision, I believe we are compelled by stare decisis to follow the supreme court's "clear[ ] · command."

¶ 41 The majority opinion seeks to distinguish *Springville Citizens* from the instant case on the basis that *Springville Citizens* involved the review of an administrative decision (thus warranting review under the substantial evidence standard applied there), while the instant case involves the review of a legislative decision (thus warranting review under the reasonably debatable standard applied in past Utah cases). Such a mischaracterization of *Springville Citizens* requires wily maneuvering around the facts and law set forth there.

¶ 42 The majority opinion specifically tries to distinguish *Springville Citizens* on three bases: (1) Past case law (predating Utah Code Ann. § 10–9–1001 (effective May 1, 1992) and *Springville Citizens*) supports the majority opinion. (2) The majority opinion describes the city council's decision in *Springville Citizens* as entailing the approval of a planned unit development (PUD), as opposed to an actual rezoning. And, (3) the majority opinion depicts *Springville Citizens*

as involving merely a challenge to the city council's failure to follow its own mandatory ordinances, as opposed to the city council's failure to show evidentiary support for its decision.

1.  The Effect of Past Case Law

¶ 43 I agree with the main opinion that under majority rule in the United States and past Utah law administrative-type decisions have traditionally been reviewed under a higher standard, akin to substantial evidence, while legislative-type decisions have traditionally been reviewed under a lower standard, akin to reasonably debatable. And, greater deference is generally given to legislative decisions because public policy suggests that the judiciary should not substitute its judgment for that of a legislative body serving at the pleasure of the citizenry. This is a solid, appealing argument.

¶ 44 However, past law and public policy should no longer matter to this court. We can cite and expound on past case law and public policy ad infinitum without affecting one whit the state of the law as it exists today. Although we had extensive case law in 1991 stating different standards of review for administrative and legislative land use decisions, the Legislature enacted a one-size-fits-all standard of review for "municipal[ ] land use decisions" when it passed section 10–9–1001. This statute states, "The courts shall: (a) presume that land use decisions and regulations are valid; and (b) determine only whether or not the decision is arbitrary, capricious, or illegal." Utah Code Ann. § 10–9–1001(3) (1999).

¶ 45 The supreme court took this broad language at face value in *Springville Citizens,* in not questioning whether the Legislature may have intended two different standards of review to arise from that single standard.[2] The supreme court did not distinguish between city councils' administrative

---

2.  Although the policy argument that administrative decisions should be reviewed under a higher standard than legislative decisions makes good sense, it is also difficult to argue that the Legislature meant to encompass two different standards—substantial evidence for administrative decisions and fairly debatable for legislative decisions—by using the single term "arbitrary [and]

capricious." In fact, the Mississippi Supreme Court went so far as to say: " 'Fairly debatable' is the antithesis of arbitrary and capricious. If a decision could be considered fairly debatable then it could not be considered arbitrary or capricious." *Fondren N. Renaissance v. Mayor and City Council of Jackson,* 749 So.2d 974, 977–78 (Miss.1999).

and legislative functions in *Springville Citizens*. Instead, the court accepted the Legislature's plain language without reservation, making the sweeping statement that "[a] municipality's land use decision is arbitrary and capricious if it is not supported by substantial evidence." *Springville Citizens*, 1999 UT 25, ¶ 24, 979 P.2d 332.[3]

¶ 46 Regardless, then, of our own views of the policy difficulties suggested by this statement and our affection for past case law, our only recourse as a lower appellate court is to state and apply the law as most recently declared by our supreme court. The statute, *see* Utah Code Ann. § 10–9–1001 (1999), followed by the supreme court's definitive interpretation of that statute in *Springville Citizens*, now supersedes any prior law recognizing a difference in the standards of review for city councils' administrative versus legislative actions.

### 2. PUD Approval Versus Rezoning

¶ 47 The majority opinion makes much of its assertion that *Springville Citizens* involved the approval of a PUD "rather than the reclassification of the zoning district." The majority regards the approval of a PUD to be administrative, while acknowledging that rezoning is a classic legislative activity. I have a few responses to this viewpoint.

¶ 48 First, without even considering further facts from *Springville Citizens*, my research reveals that PUD approval alone is widely regarded to be a legislative function. *See, e.g., Stokes v. City of Mishawaka*, 441 N.E.2d 24, 28 (Ind.Ct.App.1982) (deeming legislative city council's decision to approve application to zone land for PUD); *State ex rel. Helujon, Ltd. v. Jefferson County*, 964 S.W.2d 531, 535–36 (Mo.Ct.App.1998) (stating approval of PUD classification is legislative zoning decision); *Todd Mart, Inc. v. Town Bd. of Webster*, 49 A.D.2d 12, 370 N.Y.S.2d 683, 689 (N.Y.App.Div.1975) (noting "[a] ma-

jority of … jurisdictions [considering this question] hold that the secondary determination, whether to approve a particular planned unit development district, is a legislative function exercised by the local zoning authority"); *Harrison v. City of Kettering*, No. 12728, 1991 WL 208408, at *2, 1991 Ohio App. LEXIS 4911, at *4 (Oct. 8, 1991) ("[A]pproval of a PUD plan is a legislative activity."); *Lutz v. City of Longview*, 83 Wash.2d 566, 520 P.2d 1374, 1376 (1974) (stating, in analyzing legal effect of approving PUD for certain parcel of land, "[t]he authorities are clear that such a change in permitted uses is a rezone or amendment of the zoning ordinance[;] '[t]he end product is, of course, an amendment to the zoning ordinance which reclassifies the land in question'" (citation omitted)). *But see South Creek Assocs. v. Bixby & Assocs., Inc.*, 781 P.2d 1027, 1032 n. 8 (Colo.1989) ("Although the enactment of a PUD enabling ordinance is a legislative function, the process of reviewing a particular PUD plan for approval is 'administrative or adjudicative in nature'…." (Citation omitted.)).

¶ 49 However, even assuming the distinction between a PUD approval and a garden variety rezoning was implicitly important to the supreme court in setting forth the substantial evidence standard of review, if we dig deeper into the fact scenario underlying *Springville Citizens*, we see a city council decision that has all the characteristics of a legislative decision, not an administrative one. Approval of the PUD resulted in an ordinance amending the zoning map—the land at issue was *rezoned* to a classification that would accommodate the PUD. *See Springville Citizens for a Better Community v. City of Springville*, 1999 UT 25, ¶¶ 2, 10, 979 P.2d 332; 2 Kenneth H. Young, *Anderson's American Law of Zoning* § 11.11, at 461 n. 14 (4th ed.1996) (noting "[z]oning ordinance which reclassified land

---

**3.** The majority opinion supports its analysis with the observation that the supreme court cited *Patterson v. Utah County Board of Adjustment*, 893 P.2d 602 (Utah Ct.App.1995), a case involving the review of an administrative decision, in setting forth the substantial evidence standard in *Springville Citizens*. However, I do not see that as a basis for distinguishing *Springville Citizens*

from the case at issue. After all, if—as I believe—*Springville Citizens* stands for the proposition that both administrative and legislative decisions are to be reviewed under the substantial evidence standard, it does not matter from which kind of case the enunciation of the substantial evidence standard is cited.

... to planned development is a legislative act"); *see, e.g., Native Sun/Lyon Communities v. City of Escondido,* 15 Cal.App.4th 892, 19 Cal.Rptr.2d 344, 355 (1993) ("It is the settled law of this state 'that zoning ordinances, whatever the size of the parcel affected, are legislative acts.'"); *Fondren N. Renaissance v. Mayor and City Council of Jackson,* 749 So.2d 974, 977 (Miss.1999) (reviewing as legislative city council's decision to approve specific tract for PUD).

¶ 50 Obviously, this is all unpersuasive to my colleagues. Their opinion seems so invested in the policy considerations flowing from the labeling of the city council's decision as administrative, instead of legislative, that it will not allow the law or the facts of *Springville Citizens* to interfere. Although the majority opinion concedes that "some authorities ... conclude that PUD approval is a legislative act," it further observes "that those authorities ... went on to apply the highly deferential fairly debatable review appropriate to legislative acts." However, assuming for a moment that no Utah case, including *Springville Citizens,* tells us whether Utah law considers PUD approvals legislative, it is inescapable that the majority of authorities do. That those same authorities go "on to apply the highly deferential fairly debatable review" is entirely inconsequential because *our* supreme court did not. It applied the substantial evidence standard, regardless of whether one makes the argument the decision reviewed was administrative or legislative.

¶ 51 Aside from that, I believe that *Springville Citizens* is good precedent for the proposition that Utah *does* recognize PUD approvals (at least those involving an amendment to the zoning map) as legislative. The citizens group in *Springville Citizens* had wanted to appeal the city council's decision approving the PUD to a board of adjustment under Utah Code Ann. §§ 10-9-703 and 10-9-704(1)(a) (1999). *See Springville Citizens for a Better Community v. City of Springville,* No. 960400547, slip op. at 16–17 (Dist.Ct.Utah Sept. 5, 1997). However, the city disagreed, "asserting that the board of adjustment is not empowered to hear appeals from zoning decisions made by the city coun-

cil." *Id.* at 17. The district court concurred with the city:

> In this case the city council approved an ordinance amending the city zoning map. *That is a legislative action by a legislative body—the city council—as to which the board of adjustment has no appellate jurisdiction.* I am persuaded that plaintiffs did not have a right to appeal to the board of adjustment from what they considered an adverse decision by the city council.

*Id.* at 17 (emphasis added).

¶ 52 When the citizens group appealed this decision to the supreme court, along with the other issues in *Springville Citizens,* the supreme court stated:

> As to section 10-9-703, the district court simply concluded that plaintiffs could not appeal the overall approval of the P.U.D. to the board of adjustments; this, however, overlooked the nature of plaintiffs' claims under that section, namely, that certain City actions *apart from the final P.U.D. approval* were appealable to the board of adjustments, i.e., the City's issuance of building permit 03675 and the recording of Plat 4.

*Springville Citizens,* 1999 UT 25, ¶ 32, 979 P.2d 332 (emphasis added). Thus, the supreme court agreed with the district court that final PUD approval was not an administrative council action appealable to a board of adjustment. In this Utah case, the supreme court sanctioned the district court's ruling that the final PUD approval was legislative.

¶ 53 Finally, to support the assertedly meaningful distinction that *Springville Citizens* involved the approval of a PUD "rather than the reclassification of the zoning district," the majority opinion focuses on the portion of the property zoned H-1, which permitted PUD development but not subdivision development. The main opinion states, "The developer thus did not require a new zoning classification but rather required approval for a proposed PUD under the existing zoning classification." This patently ignores the facts of *Springville Citizens.*

¶ 54 Before the PUD approval, the bulk of the land at issue had been primarily zoned RA-1-20,000, a *residential agricultural zone,*

"permitting homes on lots having a minimum of 20,000 square feet." *Springville Citizens,* No. 960400547, slip op. at 3. The small remainder of the parcel was zoned H–1, which only allows the use of "single family homes located in a PUD." *Id.* at 3. Mischaracterizing the facts, the majority opinion implies that the whole parcel was zoned to accommodate PUDs—which the majority opinion takes to mean that the zoning ordinance passed by the Springville City Council did not rezone the property.

¶ 55 Unless the only part of the property being used for the PUD was the small remainder of the parcel zoned H–1, the Springville ordinance amending the zoning map necessarily effected a rezoning. After all, the residential agricultural zone did not include PUDs. Although *Springville Citizens* does not explicitly state which portion of the property was to be used for the PUD, I believe that the area zoned residential agricultural was at least partially rezoned to allow the PUD. I infer this from the fact that the residential agricultural zone required lot sizes to be a minimum of 20,000 square feet. And, one of the conditions that the city council had placed on its final approval of the PUD application was to "allow[ ] four of the lots to have less than 20,000 square feet but not less than 17,000 square feet." *Springville Citizens,* 1999 UT 25, ¶ 9, 979 P.2d 332. Thus, it seems that at least four of the lots were to be drawn from the larger residential agricultural area.[4]

¶ 56 I am therefore unpersuaded by the majority's assertion that categorizing the city council's action as a PUD approval, as opposed to a rezoning, is a meaningful distinction between *Springville Citizens* and the instant case.

### 3. Review of Procedural Defects

¶ 57 I disagree that *Springville Citizens* was purely a review of procedural defects regarding the city council's adherence to procedures mandated by city ordinances. To the contrary, immediately following the supreme court's enunciation of the substantial evidence criterion for reviewing a municipality's land use decision, the court proceeded in paragraph twenty-five to substantively review the facts in the record to determine whether the city council's decision to approve the PUD application was arbitrary and capricious under section 10–9–1001, using the substantial evidence standard. *See* Utah Code Ann. § 10–9–1001 (1999); *Springville Citizens for a Better Community v. City of Springville,* 1999 UT 25, ¶¶ 24–25, 979 P.2d 332. *After* that paragraph, the opinion turned to a separate examination of whether the city council's decision was illegal under section 10–9–1001, at which point the court reviewed the procedural irregularities in the approval process involving the city council's noncompliance with city ordinances. *See* Utah Code Ann. § 10–9–1001 (1999); *Springville Citizens,* 1999 UT 25, ¶¶ 26–30, 979 P.2d 332. I therefore see in this point no useful tool for differentiating *Springville Citizens* from our case.

¶ 58 Based on the above discussion, I believe *Springville Citizens* is directly on point with the instant case. With this precedent in place, I have no choice but to agree with Harmons that the arbitrary and capricious standard requires a review of the record for substantial evidence supporting the city council's denial of Harmons's rezoning application. In my view, the trial court incorrectly reviewed the record under a reasonably debatable criterion.

### B. Substantial Evidence Review of Record

¶ 59 Having established my position that the substantial evidence standard should be applied in reviewing the Draper City Coun-

---

4. Even if the entire parcel had been zoned H–1, which would allow a PUD, authority exists stating that the city council's passage of an ordinance amending the zoning map and approving the PUD would still be legislative. *See, e.g., Native Sun/Lyon Communities v. City of Escondido,* 15 Cal.App.4th 892, 19 Cal.Rptr.2d 344, 355 (1993) (stating " 'zoning ordinances, whatever the size of the parcel affected, are legislative acts' " (citation omitted)); *Gray v. Trustees, Monclova Township,* 38 Ohio St.2d 310, 313 N.E.2d 366, 369 (1974) ("[T]he action of the board [of township trustees] in approving [a PUD] plat is the functional equivalent of traditional legislative zoning, even though the entire PUD area is covered by the same 'nominal' zoning classification both before and after approval of the plat.").

cil's decision, I now analyze the record in this case to determine whether the city council's decision was arbitrary and capricious under the substantial evidence standard.

¶ 60 Using the substantial evidence standard, I will "review the evidence in the record to ensure that the City proceeded within the limits of fairness and acted in good faith." *Springville Citizens for a Better Community v. City of Springville*, 1999 UT 25, ¶ 24, 979 P.2d 332. I also must decide if, in view of *all* the evidence before the city council, reasonable minds could arrive at the same conclusion as the city council did. *See id.* at 336–37; *Patterson v. Utah County Bd. of Adjustment*, 893 P.2d 602, 604 (Utah Ct.App.1995). Still, I will not weigh the evidence afresh or insert my judgment in place of the municipality's. *See Springville Citizens*, 1999 UT 25, ¶ 24, 979 P.2d 332; *Patterson*, 893 P.2d at 604. Substantial evidence is " 'more than a mere "scintilla" of evidence ... though "something less than the weight of the evidence." ' " *Patterson*, 893 P.2d at 604 n. 6 (citations omitted).

¶ 61 To begin my review, I again recite the city council's reasons for its decision: (1) "concern about a 71,700 square foot, 24–hour store being considered because it is not in harmony with the Neighborhood Commercial useage [sic] of the area"; (2) "the size and the shape of the property is not suited for a complex of the size proposed"; (3) "the increased traffic, child and family safety issues which have been raised have not been sufficiently resolved"; and (4) because "on the east side of the street smaller scale commercial has been approved ..., if the Council designates [the property] for C–2 commercial development, too many things are allowed in a C–2 zone that are not compatible with residential neighborhoods."

¶ 62 I now review the evidence in the record supporting each of these four reasons. First, I address the council's fear that a grocery store of the size and hours proposed would not fit a neighborhood commercial use.

(The development was planned to be about 100,000 square feet of building space on 10.277 acres.) The record evidence overwhelmingly suggests just the opposite of the council's fear: The planning commission stated in its January 2, 1998 staff report that "the proposed uses, if appropriately designed for the site, are consistent with the purpose of the proposed zoning." [5] The certified appraiser's report quotes an appraising treatise stating that a grocery store fits the definition of neighborhood commercial. The planning commission cited industry standard criteria for neighborhood commercial usage showed an expectation that such a usage would involve about 30,000–100,000 square feet per 5–7 acres, while community commercial runs about 100,000–300,000 square feet per 10–30 acres. Thus, the planning commission noted that this development is toward the top of neighborhood commercial and the very bottom of community commercial. The planning commission staff report, dated January 30, 1998, also quoted the Urban Land Institute's *Shopping Center Development Handbook* as stating, "In neighborhood shopping centers the supermarket is the key," and, "The Supermarket is the anchor tenant in traditional neighborhood centers."

¶ 63 The sole contrary evidence in the record came from citizen Kent Cram who read the definition of mixed use areas into the record at a January 8, 1998 planning commission meeting, concentrating on the language that mixed uses "promote day and evening use." He stated his opinion that the reference to day and evening use excludes "24–hour–a–day use." He further remarked, "[A]lthough this area may be appropriate for commercial, a smaller scale use would respect the neighborhood character, and a 71,700–square–foot store ... is not 'small scale.' " Planning commission staff immediately replied, "[T]his development fits within 'smaller scale,' because it will not be a huge center that will attract regional traffic." I would conclude that the unsupported

---

5. The staff report says, "if appropriately designed for the site." This does not suggest that, once the rezoning occurred, Harmons could at its discretion either appropriately or inappropriately design its development to fit the site. If the rezoning had been approved, Harmons would still have had to jump through the hoops required by the conditional use permit and site plan approval processes. Presumably, at those critical points, the planning commission would ensure that the development was appropriately designed.

opinion of a lone citizen with no known experience or training in these areas should hardly persuade a reasonable mind to choose that opinion over the extensive evidence from professional sources on the neighborhood commercial nature of this type of proposed development. *Cf. Davis County v. Clearfield City,* 756 P.2d 704, 712 (Utah Ct.App.1988) (stating, in conditional use permit case *using substantial evidence review under arbitrary and capricious standard,* that " '[c]itizen opposition is a consideration which must be weighed, but cannot be the sole basis for the decision to deny' " and local government entity " 'must rely on facts, and not mere emotion or local opinion' " (citations omitted)).

¶ 64 I next review the city council's concern that "the size and shape of the property is not suited for a complex of the size proposed." Again, the evidence most vehemently leads to the opposite conclusion. The planning commission staff report of January 2, 1998 states, "The property, with the proposed conditions of approval, will be able to accommodate the proposed uses, if designed appropriately." [6] Further, the January 30, 1998 staff report quotes page forty-two of the *Shopping Center Development Handbook* which recommends that

> [a]s a rule of thumb for checking the adequacy of site area for a shopping center, one can figure roughly 10,000 square feet of building area and 30,000 square feet of parking area for each 40,000 square feet (about one acre) of site area. For example a site of 10 acres for conventional shopping center development will readily accommodate 100,000 square feet of building area in the center.

The staff report thus made the following conclusion about the adequacy of the site area: "The proposed site is 10.27 acres in size and the gross leasable area (GLA) is 101,500 square feet. At a ratio of 1,000 square feet per acre, the square footage of the proposed structures appears to be in line with the size of the property."

¶ 65 Meanwhile, the sole evidence suggesting otherwise was again Mr. Cram's opinion. He stated at the January 8, 1998 planning commission meeting that "the size and shape of this property is not suited for a complex of this size." While Mr. Cram is certainly entitled to his opinion, as I have stated, such an unsubstantiated assertion from a citizen with no known experience or training in this field cannot hold up to the learned conclusion of the planning commission, based on a professional treatise. *See id.* I would therefore hold that, based on the evidence in the record, a reasonable mind would not have endorsed Mr. Cram's opinion over that of the planning commission.

¶ 66 I now visit the third reason given by the city council: "the increased traffic, child and family safety issues which have been raised have not been sufficiently resolved." Mr. Cram is also the one who raised these potential trouble areas.[7] Regarding traffic problems, he said

> he has been advised the children living in Camden Park will be attending school at Sprucewood Elementary, which is located at approximately 1000 East and 12000 South. Children from Camden Park will have to cross 700 East to get to school, and parents are very concerned their safety will be compromised because of the increased traffic. In addition, residents feel accessing their subdivision will be more difficult because of the increased traffic.

Again, Mr. Cram did not corroborate his opinion—e.g., with evidence from school administrators or police traffic officers about the possibility that school children could be placed in jeopardy by the increase in traffic caused by the development. Further, Mr. Cram presented no traffic studies or evidence from police traffic officers or other experts showing how subdivision residents could perhaps be harmed by the increased traffic.

---

**6.** Here, the planning commission staff refers to the conditions it planned to put on the conditional use permit.

**7.** Two other citizens stated for the record that they believed the proposed Harmons development would increase traffic in the area. However, these two citizens did not voice any negative inferences regarding their perceptions that traffic would increase.

¶ 67 In contrast, the record is replete with evidence showing the increased traffic from the development would not substantially affect the area. For instance, Harmons commissioned a traffic study of the intersection at issue by transportation consultants Fehr & Peers Associates. The Fehr & Peers report concluded that forty-five percent of the traffic would be "pass-by trips"[8] that would not "affect traffic volumes at the access locations." The report further states that "[t]he intersection currently operates efficiently and will continue to operate effectively with the proposed development." At the planning commission meeting, planners noted that 11400 South has been "master planned for several years to be [a] 106–foot right[ ]-of-way (five lanes, two in each direction with a turning lane)." Thus, the evidence showed that the area was designated to be high traffic. In its January 30, 1998 staff report, the planning commission again quoted the *Shopping Center Development Handbook* which discusses typical types of access for each type of commercial development. The *Handbook* states that "[n]eighborhood centers are located for access from collector streets. The location must avoid having minor residential service streets as its principal access for automobile traffic." The planning commission thus determined that "[t]he location of the project on 11400 South and 700 East, both streets designed to be major collectors, lends the site to a neighborhood or community commercial type development."

¶ 68 Regarding potential child and family safety issues, according to the record, the only source for the city council's concern was again Mr. Cram who stated at the January 8, 1998 planning commission meeting that "not only will a complex of this type encourage teen-age loitering and vandalism, but it will bring crime into the area as well." The following excerpt from the meeting's minutes shows Mr. Cram's effort to back up his opinion:

> To support his position, Mr. Cram gave the Commissioners a copy of a newspaper article which appeared in the Deseret News stating violent activities done by members

of the Straight Edge movement are occurring, among other places, in shopping center parking lots. Mr. Cram then passed out a report obtained from the Roy City Police Department detailing the crimes that have taken place at the Roy City Harmons during 1997. He said there was a total of 259 crimes reported, with the most serious being a kidnaping and rape.

The record contains no other evidence about family safety or likelihood of increased crime in the area because of the development. Mr. Cram did not present information from the local police department about the activity level of Straight Edgers in the area, nor did he present information about crimes reported at grocery stores in the same county as Draper, let alone grocery stores in the same city. I am not convinced that a reasonable mind would accept these vague and distant reports as persuasive evidence of crime and safety issues that might occur at the particular site should it be developed as proposed.

¶ 69 Based on the above discussion, I would conclude that there is not substantial evidence in the record to support the city council's reasoning that "increased traffic, child and family safety issues which have been raised have not been sufficiently resolved."

¶ 70 Finally, I address the city council's concern that "on the east side of the street smaller scale commercial has been approved and, if the Council designates [the property] for C–2 commercial development, too many things are allowed in a C–2 zone that are not compatible with residential neighborhoods." I have scoured the record for evidence about this matter, but found not one shred of information to review. Consequently, I must conclude that the record would not support reasonable minds in relying on this reason.

¶ 71 Based on my review of the record regarding each reason the city council gave for its denial of Harmons's rezoning request, I would conclude the decision is not supported by substantial evidence. I would thus conclude the city council's decision was arbitrary and capricious under Utah Code Ann. § 10–9–1001(3)(b) (1999).

---

8. The Fehr & Peers study defines "pass-by trips" as "vehicles that are already in the area, but are attracted from adjacent streets to the site due to the type of development."

CONCLUSION

¶ 72 I would hold that the arbitrary and capricious standard under Utah Code Ann. § 10–9–1001(3)(b) (1999) requires a review of the record for substantial evidence. I believe the trial court was thus incorrect in enunciating and applying the reasonably debatable criterion to the city council's decision. Based on the undisputed facts in the record, I would further conclude that the council's decision is not sustained by substantial evidence in the record. Because the decision would therefore be arbitrary and capricious, I would reverse the trial court's grant of summary judgment for Draper and remand for further proceedings consistent with this dissent.